IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| TRACE MINERALS RESEARCH, L.C., a Utah Limited Liability Company,<br><br>        Plaintiff,<br><br>vs.<br><br>MINERAL RESOURCES INTERNATIONAL, INC., a Utah corporation; BRUCE ANDERSON, an individual; and JOHN DOES I through X,<br><br>        Defendants. | ORDER<br>AND<br>MEMORANDUM DECISION<br><br>Case No. 1:06-CV-00068 TC |
| MINERAL RESOURCES INTERNATIONAL, INC.,<br><br>        Counterclaim Plaintiff,<br><br>vs.<br><br>TRACE MINERALS RESEARCH, L.C.; ELEMENTS OF NATURE, INC.; MATT KILTS; CRAIG MILES; SCOTT PERKES; JAMES CRAWFORD; and JOHN DOES I through X,<br><br>        Counterclaim and Third Party Defendants. | |

Plaintiff Trace Minerals Research, L.C. and the individual Plaintiffs, Matt Kilts, Craig Miles, Scott Perkes, and James Crawford (collectively "TMR") seek partial summary judgment and injunctive relief prohibiting Defendants Mineral Resources, International, L.C. and Bruce Anderson (collectively "MRI") from using TMR's trademark ConcenTrace to divert Internet traffic to MRI's website and from describing itself as "the source of ConcenTrace." TMR has

also asked the court to hold, as a matter of law, that MRI has infringed TMR's trademark. Finally, TMR has moved for partial summary judgment on MRI's claim that TMR breached its contracts with MRI when TMR obtained products from a source other than MRI.

TMR's motion for partial summary judgment is DENIED IN PART AND GRANTED IN PART.[1] Genuine disputes of material fact exist on the questions of whether MRI breached its agreements by using TMR's trademark beyond the scope of use permitted by the agreement and whether TMR breached the agreements by obtaining and selling products obtained from a source other than MRI. TMR's motion is GRANTED IN PART because the evidence shows that MRI's right to use of TMR's trademark ended when TMR terminated MRI's license on March 10, 2005. But certain remedial actions taken by MRI moot TMR's request for injunctive relief.

## I. FACTUAL BACKGROUND

The factual background is set forth at length in the written submissions of the parties. The court will repeat only those facts necessary to explain its decision. In light of the standard governing summary judgment motions, the following factual exposition is largely confined to material that the parties do not dispute. Any disputed facts, or facts derived from challenged evidentiary sources, are identified and are either not considered or resolved in favor of the nonmoving party.

### A.   Before the Sale of TMR

TMR and MRI were once both under the umbrella of the Anderson family group of companies. MRI obtains minerals and trace minerals from the Great Salt Lake, using them to

---

[1] The court did not consider any contested portions of Mr. Miles' affidavit in its analysis because it was not necessary to reach its decision. Accordingly, MRI's motion to strike portions of Mr. Miles' affidavit is DENIED. MRI's Rule 56(f) motion is also DENIED because the court does not need further testimony to reach its decision regarding TMR's partial summary judgment motion.

manufacture a variety of dietary supplements. Bruce Anderson was President/CEO of Mineral Resources International, Inc. from 1996 to 1999 and later from 2005 through the present day. Mr. Anderson also served as President of TMR from its inception in 1996 through its sale in 1999.

TMR was the marketing arm of the Anderson family group of companies in the United States, while MRI served as the manufacturer of all the products and the marketing arm for all other markets outside the Unites States health food market. In May 1998, the principals of TMR and the principals of MRI signed a Supply Agreement ("Original Supply Agreement"), which memorialized the roles of TMR and MRI, outlined the various duties TMR owed to MRI, and the corresponding duties that MRI owed to TMR.

TMR granted MRI a license to use the TMR trademarks, including ConcenTrace, in the Original Supply Agreement. The Original Supply Agreement stated that use of the trademarks licensed to MRI was "on a fully paid and royalty free basis, in perpetuity, for as long as this Agreement remains in effect." (Original Supply Agreement at § 17.3, attached as Ex. B to Anderson Aff. (which is attached as Annex A to Mem. in Opp'n to Mot. for Partial Summ. J. and for Inj. Relief and in Supp. of MRI's Rule 56(f) Mot. ("Opp'n Mem.")).)

In his affidavit, Mr. Anderson testified that he directed the creation of TMR's website in approximately 1996. He stated that at the time of the website creation, MRI and TMR mutually shared in the benefits of combined marketing efforts, such as trade shows and the use of the Internet.

**B.**     **The Sale of TMR**

In April 1999, TMR's owners sold their membership interest in TMR to Matt Kilts, Scott Perkes and Craig Miles for more than $2,000,000. A document titled "Trace Minerals Research

Stock Purchase Agreement" (hereinafter "Stock Purchase Agreement") details the terms of the sale.

Section 5.4 of the Stock Purchase Agreement states that "[i]n consideration of MRI's continued use of TMR's trademarks with MRI's existing accounts, MRI agrees to pay TMR 1% of MRI's sales to such accounts, with an annual cap of $7,500. That agreement is attached as Exhibit K." (Trace Minerals Research Stock Purchase Agreement at § 5.4, attached as Ex. C to Anderson Aff.) Exhibit K was circulated among the parties at the time the Stock Purchase Agreement was executed but Exhibit K was never executed. Notably, MRI admitted that TMR owns the federally registered trademark ConcenTrace. (See Opp'n Mem. at v.)

**C.     The Supply Agreements**

In connection with the 1999 sale, the parties agreed to enter into a second Supply Agreement entitled AGREEMENT BETWEEN MINERAL RESOURCES INTERNATIONAL AND TRACE MINERALS RESEARCH ("Supply Agreement I"). The parties did not sign the Supply Agreement I until 2001, although they agreed that it was to take effect retroactively as of April 6, 1999. They also agreed that Supply Agreement I replaced and superceded the Original Supply Agreement.

> WHEREAS, TMR has been wholly owned by the Anderson family in the past and a majority control of TMR is being sold to investors . . ., and such change of ownership and voting control has facilitated the need to negotiate and sign a new version of this Supply Agreement, superseding the previous supply agreement that has been in effect between TMR and MRI since May at, 1998;

(Supply Agreement I at p. 3, attached as Ex. C to Anderson Aff.) In § 27.1, TMR and MRI reiterated that Supply Agreement I superceded the Original Supply Agreement. (Id. at § 27.1.)

In April 2004, MRI and TMR entered into yet another agreement, Supply Agreement II, which expressly superceded Supply Agreement I: "[T]his AGREEMENT supersedes and cancels

4

all prior agreements, verbal or written, between MRI and TMR in relation to the subject matter contained herein, except for all non-disclosure/confidentiality agreements signed prior to the effective date of this Agreement." (Supply Agreement II at § 27.1, attached as Ex. G to Anderson Aff.)

The parties agreed in Supply Agreement II that TMR would purchase certain "PRODUCTS" from MRI to be sold only in the Exclusive Territory, which is defined as Health Food Stores in the United States. (Id. at § 2.1.) Additionally, TMR agreed to purchase "BULK minerals" from MRI for sale to BULK accounts that MRI had previously licensed to use the minerals in the manufacture of that customer's own food supplement products. (See id. at §§ 9.4-9.6.)

Section 9.4 of Supply Agreement II reads:

> Notwithstanding section 9.1 above, TMR shall not obtain any sea water, Great Salt Lake water, and/or trace mineral complex products or product components from any source other than MRI/Northshore for as long as TMR remains MRI's exclusive distributor in the Health Food Store Channel, and for as long as MRI is competitive on a supplement grade level. As soon as TMR believes that MRI is not competitive, then TMR will provide notice to MRI along with proof and documentation and MRI shall have thirty (30) days for MRI to become competitive. After that 30 day period, if MRI is still not competitive, then TMR will provide another 30 day notice to MRI that TMR intends to source such components elsewhere, in which case then MRI shall have the right to become competitive at any time during that second 30 day period.

(Id. at § 9.4 (emphasis added).)

In Supply Agreement II, the parties agreed that they would not use the other's trademarks "without the prior written consent of the other." (Id. at § 16.2.)

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 permits the entry of summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

5

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Fed. R. Civ. P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  The court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  The nonmovant must set forth "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [to overcome a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the plaintiff." Liberty Lobby, 477 U.S. at 252; see also Anderson v. Coors Brewing Co., 181 F.3d 1171, 1175 (10th Cir. 1999) ("A mere scintilla of evidence supporting the nonmoving party's theory does not create a genuine issue of material fact.").

### III. ANALYSIS

**A.     Rule 56(f) Motion**

MRI's Rule 56(f) motion is denied because the court does not need further testimony to reach its decision regarding TMR's partial summary judgment motion.

**B.     Motion to Strike Portions of Craig Miles' Affidavit**

The court did not consider any contested portions of Mr. Miles' affidavit in its analysis because it was not necessary to reach its decision.  According, MRI's motion to strike portions of Mr. Miles' affidavit is denied.

**C.     TMR's Motion for Partial Summary Judgment**

TMR asks the court to find that (1) MRI breached Section 5.4 of the Stock Purchase

Agreement by using TMR's trademarks beyond the scope of use permitted by that section and continuing to use those marks after TMR terminated the license; (2) MRI committed trademark infringement and unfair competition because MRI caused consumer confusion when it used TMR's trademarks to direct consumers to its website; and (3) TMR did not breach the Supply Agreement by selling products obtained from another source after MRI refused to supply those products to TMR.  TMR is also asking that MRI be permanently enjoined from using or displaying any of TMR's trademarks.

      1.      **Breach of the Stock Purchase Agreement**

Section 5.4 of the Stock Purchase Agreement recites "[i]n consideration of MRI's <u>continued use</u> of TMR's trademarks with MRI's existing accounts, MRI agrees to pay TMR 1% of MRI's sales to such accounts, with an annual cap of $7,500.  That agreement is attached as Exhibit K."  (Stock Purchase Agreement at § 5.4 (emphasis added), attached as Ex. C to Anderson Aff.)  The parties agree that Section 5.4 is a license agreement.  And MRI admitted that TMR owns the federally licensed trademark ConcenTrace.

TMR maintains that MRI breached Section 5.4 of the Stock Purchase Agreement in two separate ways.  First, TMR contends that MRI used its trademark ConcenTrace beyond the scope of use permitted in Section 5.4.  Specifically, TMR argues that MRI violated Section 5.4 when MRI used ConcenTrace as a metatag to divert Internet traffic to MRI and when it posted the following statement on its website: "Mineral Resources International—The Source of ConcenTrace."  Second, TMR argues that MRI breached Section 5.4 when MRI continued to use those marks after TMR terminated MRI's license on March 9, 2005.

      a.      <u>"continued use"</u>

Trademark license disputes are governed by general rules of contract interpretation.  2 J.

Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 18:43 (4th ed. 2006) (hereinafter "McCarthy on Trademarks"). In Utah, a court may enter summary judgment on the issue of contract interpretation if the language of the contract is unambiguous. Gomez v. American Elec. Power Serv. Corp., 726 F.2d 649, 651 (10th Cir. 1984). A contract provision is not ambiguous merely because the parties have offered different interpretations. See Beaver Creek Coal v. Nevada Power Co., No. 89-4114, 1992 WL 113747 (10th Cir. 1992) (citing Plateau Mining Co. v. Utah Div. of State Lands, 802 P.2d 720, 725 (Utah 1990).)

      The parties dispute whether the term "continued use"in Section 5.4 is ambiguous. TMR contends it is not; MRI contends it is. MRI argues that "continued use" is ambiguous in two ways: (1) whether that phrase restricted the use to a particular type or types of use; and (2) whether "continued" means perpetual or something else.

      According to TMR, the phrase "MRI's continued use of TMR's trademarks with MRI's existing accounts" clearly limits MRI's use of the trademarks to the type of uses existing when the license was executed on April 6, 1999. TMR argues that MRI's use of ConcenTrace as a meta keyword to divert Internet traffic to the MRI website and MRI's description of itself as the source of ConcenTrace goes beyond the "continued use" limitation of Section 5.4. TMR relies on evidence that MRI did not establish its website until June 29, 1999, more than two months after the Stock Purchase Agreement was executed. Because Section 5.4 defines MRI's permitted use as "continued use . . . with existing accounts," TMR argues that the use of TMR's trademarks as metatags to divert Internet traffic to an MRI website that did not even exist when the license was granted goes beyond the scope of the license.

      MRI disagrees, claiming that when Mr. Anderson directed the creation of the TMR website in approximately 1996, MRI and TMR mutually shared in the benefits of combined

marketing efforts, including the use of the Internet. So, according to MRI, its use of the trademark on its own website is a "continued use" under Section 5.4. In his affidavit, Mr. Anderson stated that:

> At the time of the sale, MRI used the Internet as a tool for its marketing to international markets and other non-health food store domestic markets while the TMR division of the Anderson family companies used the Internet primarily for marketing to its Health Food Stores in the United States.

(Anderson Aff. ¶ 10.)

TMR further argues that because MRI was not using the phrase "source of ConcenTrace" on the Internet before April 1999, that its use is not a "continued use." But MRI maintains that the use of the phrase "the source of ConcenTrace" on its website was within the scope of MRI's license. MRI argues that its use of the phrase is an implied right inherent in the license that TMR granted to MRI because "if MRI received a license to use the ConcenTrace trademark, but was prohibited from claiming the status of [the] 'source' of the product, the license becomes severely limited, which is directly contradicted by the broad and unqualified terms of the Original Supply Agreement . . . ." (See Opp'n Mem. at 4.) But the Original Supply Agreement was expressly cancelled and superceded by Supply Agreement I and the new license negotiated by the parties in Section 5.4 allows only "continued use . . . with existing customers." Furthermore, courts have consistently rejected attempts by licensees to expand the scope of the license to include "implied" rights that are not expressly authorized by the license. See Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc., 88 F. Supp. 2d 914, 921-22 (C.D. Ill. 2000) ("The license is a limited grant of authority to use the trademark in a defined way. Another use is not authorized by the grant and is a breach").

The term "continued use" in Section 5.4 is ambiguous. Given the foregoing conflicting evidence, the court cannot decide whether MRI did, in fact, go beyond the rights granted by

9

Section 5.4.  Accordingly, TMR's request for summary judgment on the claim that MRI breached Section 5.4 of the Stock Purchase Agreement by using TMR's trademarks beyond the scope of use permitted is denied.

    b.  MRI's use of the Trademark after March 9, 2005

On March 9, 2005, TMR wrote to MRI that "MRI continues to misappropriate TMR's IP—names, designations, products—through its website and worldwide marketing and sales. . . Effective March 10, 2005, the IP agreement is cancelled based upon MRI's breach."  (Letter from TMR to MRI (Mar. 9, 2005), attached as Ex. I to Anderson Aff.)

TMR maintains its termination of MRI's license was effective on March 10, 2005.  But MRI argues that TMR's purported termination was not effective because (1) it had a license to use TMR's trademarks in perpetuity; and (2) TMR acquiesced to post-termination usage.

    *1.*  *Terminable at Will*

MRI contends that "continued use" means perpetual, commercially reasonable use of the trademarks, which is directly supported by the Original Supply Agreement.  (Opp'n Mem. at 2.)  MRI claims that "continued use of TMR's trademarks" is a reference to that license.  The Original Supply Agreement stated that use of the trademarks licensed to MRI was "on a fully paid and royalty free basis, in perpetuity, for as long as this Agreement remains in effect."  (Original Supply Agreement at § 17.3.)

But the parties agreed that Supply Agreement I replaced and superceded the Original Supply Agreement:

> WHEREAS, TMR has been wholly owned by the Anderson family in the past and a majority control of TMR is being sold to investors . . ., and such change of ownership and voting control has facilitated the need to negotiate and sign a new version of this Supply Agreement, superseding the previous supply agreement that has been in effect between TMR and MRI since May at, 1998[.]

(See Supply Agreement I at p. 3.) And then Supply Agreement II provides: "[T]his AGREEMENT supersedes and cancels all prior agreements, verbal or written, between MRI and TMR in relation to the subject matter contained herein, except for all non-disclosure/confidentiality agreements signed prior to the effective date of this Agreement." (Supply Agreement II at § 27.1.) These provisions prove that the "perpetual" license that MRI is asserting as a basis for its refusal to comply with TMR's termination demand (see Original Supply Agreement at § 17.3) was superceded and canceled by Supply Agreement I and Supply Agreement II. Instead, MRI's license to use ConcenTrace was governed by Section 5.4 of the Stock Purchase Agreement, which is silent as to duration.

"The term of the license should be specifically stated in the license because the law of some states provides that a license without a stated term is terminable at the will of either party upon reasonable notice." 2 McCarthy on Trademarks § 18:43.[2] If the term of the license is not provided, trademark license contract disputes are governed by the general rules of contract interpretation. Id. A license containing no time frame is generally terminable at will. Bunn-O-Matic Corp., 88 F. Supp. 2d at 922; Dial A Mattress Operating Corp. v. Mattress Madness, Inc., 847 F. Supp. 18, 20 (E.D.N.Y. 1994).

Accordingly, because Supply Agreement II did not provide a time frame for the duration of the license, the license was terminable at will. And TMR effectively terminated MRI's license

---

[2] Citing First Flight Associates, Inc. v. Professional Golf Co., Inc., 527 F.2d 931 (6th Cir. 1975) ("Contracts silent on time of termination are generally terminable at will by either party with reasonable notice."); Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc., 847 F. Supp. 18, n. 1 (E.D. N.Y. 1994) ("An agreement conferring a license to use a trademark for an indefinite time, whether oral, written or by implication, is terminable at will by the licensor. . . . Although such termination may require reasonable advance notice. . . ."); Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc., 88 F. Supp. 2d 914 (C.D. Ill. 2000) ("A license containing no time frame is generally terminable at will."); Arthur L. Corbin, Corbin on Contracts, § 96; UCC § 2-309(2).

on March 10, 2005.

MRI violated the license provision of the Stock Purchase Agreement on several occasions after TMR terminated its license, including when it used the TMR trademark ConcenTrace on its website and continued to use ConcenTrace as a metatag on its website.  MRI admitted that as of January 4, 2007, the source html of the home page of MRI's website www.mineralresources.com reflected the word "ConcenTrace" as a metaname keyword.  (See Opp'n Mem at xx.)

### 2. *Acquiescence*

MRI claims that even if TMR establishes breach of the license agreement, trademark infringement or unfair competition, TMR's claims are still barred by the doctrine of acquiescence or waiver.  Acquiescence is an affirmative defense that requires a "finding of conduct on the plaintiff's part that amounted to an assurance to the defendant express or implied, that plaintiff would not assert his trademark rights against the defendant."  Creative Gifts, Inc. v. UFO, 235 F.3d 540, 547-48  (10th Cir. 2000) (quoting Kellogg Co. v. Exxon Corp., 209 F.3d 562, 569 (6th Cir. 2000).)  Acquiescence may be shown by evidence of course of dealing for so long a time that knowledge and acquiescence may be presumed.  See Lowder v. Holley, 233 P.2d 350, 354 (Utah 1951) (regarding the implied authority given to an agent by the conduct of the principal).  To establish acquiescence, MRI must show that TMR by word or deed conveyed its implied consent to MRI to use TMR's trademarks.  Bunn-O-Matic Corp., 88 F. Supp. 2d at 925 (citing TMT North Am., Inc. v. Magic Touch GmbH, 124 F.3d 876, 885 (7th Cir. 1997).)  "While as a general matter, consent is a defense only with respect to acts undertaken before an effective termination of the consent, reliance on the consent or acquiescence of the trademark owner can create an estoppel which will preclude an effective termination of the consent."  5 McCarthy on Trademarks § 31:42.

MRI's contends that TMR acknowledged MRI's right to continued use of the trademarks. MRI points to an e-mail from Matt Kilts to Mr. Anderson sent July 9, 2004, in which Mr. Kilts stated:

> <u>We are not fighting you using Concentrace on your site however we have the right to control how it is used.</u>  I know we can come up with a creative way to do that on our future joint promotions and we understand we have all bogged down due to other pressing issues.  However, <u>MRI will need to remove from its site "The source of Concentrace"</u> (which can easily be done) on MSN, which should not matter to your customers as Concentrace is listed threw out [sic] your site.

(E-mail from Matt Kilts to Bruce Anderson (July 9, 2004) (emphasis added), attached as Ex. H to Anderson Aff.)

But this ignores TMR's repeated requests after March 2005 that MRI cease using its trademarks.  For example, on June 24, 2005, TMR owner Craig Miles sent the following e-mail to Rhonda Boren and Bruce Anderson:

> We are also very frustrated and angry at the lack of respect MRI is showing TMR with regards to the "cease and desist" order given back in early March.  TMR was very clear about its issue with MRI's unathorized use of its "IP."  MRI's website is a great example of this.  ConcenTrace is fluttered all over MRI's website.  Search engines lead people to your websites when they are looking for our company and our products.  The term "MRI–The Source of ConcenTrace" couldn't be more damaging.  We have requested on many occasions that MRI stop exploiting our IP to their benefit.  That request continues to be ignored.  Obviously MRI sees a value to having that on their website and in their marketing otherwise it would have been removed by now.

(E-mail from Craig Miles to Rhonda Boren and Bruce Anderson (June 24, 2005), attached as Ex. K to Miles Aff.)

MRI tries to show acquiescence by noting that TMR accepted MRI's payment of $7,500 in April 2005 for the annual trademark licensing fee and provided MRI with an invoice for the same.  (<u>See</u> Opp'n Mem. at xxvi; Ex. L, attached to Anderson Aff.)  MRI seems to argue (without expressly doing so) that this was payment for the 2005 license, stating that "MRI also

13

continued to use the trademarks after March 2005 without objection from TMR." (Opp'n Mem. at 6.)

But the fact that TMR accepted a royalty payment from MRI on April 28, 2005, is not evidence that TMR withdrew the March 10, 2005 termination. TMR provides evidence that MRI's payment covered its use of the trademark for the previous year. TMR points to the language in Section 5.4, which sets the fee at "1% of MRI's sales . . . with an annual cap of $7,500," and argues that the fee cannot be determined or paid until the end of the year after the amount of sales is established. TMR further maintains that it rejected all payments offered by MRI for post-termination usage and continued to demand that MRI cease all use of its trademarks. Indeed, MRI acknowledged that TMR returned MRI's checks that were intended to cover the annual intellectual property licensing fee under the Stock Purchase Agreement. On March 29, 2005, Mr. Anderson sent Mr. Kilts a letter stating that:

> We note that we recently sent checks to Trace Minerals Research to cover the annual intellectual property licensing fee under the Stock Purchase Agreement and the amount that we anticipated would be the fee to cover our unlicensed use of Trace Minerals Research intellectual property. <u>Those checks were returned to us and I received an email from Scott Perkes dated February 8, 2006 in which he stated that TMR would not accept payment on IP licensing until the licensing issues are resolved.</u>

(Letter from Bruce Anderson to Matt Kilts (Mar. 29, 2006), attached as Ex. S to Miles Aff. (emphasis added).)

MRI also tries to show acquiescence by pointing to the Deoksu Trading Transaction. (See Opp'n Mem. ¶¶ 17-23.) In August 2005, Mr. Chung, a Korean buyer for Deoksu Trading Co., Ltd. ("Deoksu"), submitted an e-mail to TMR's international bulk sales manager, James Crawford, stating that his company was interested in importing and distributing ConcenTrace in Korea. (See Ex. A, attached to J. Giles Aff. (which is attached as Annex C to Opp'n Mem.).)

Mr. Crawford responded that "we can't sell to you because of an exclusive [agreement] and license agreements we have in Korea with this product." (Id.)

MRI maintains that TMR's rejection of Deoksu's inquiries clearly demonstrates TMR's acknowledgment of MRI's right to continued use of the trademarks even after TMR attempted to terminate the license. But TMR responds that its decision to prohibit customers from using trademarks pending resolution of MRI's claim that it has a "perpetual" license to use the marks in certain areas does not constitute evidence that TMR relinquished its rights. The court agrees.

For the reasons noted above, the court rejects MRI's assertion that TMR's claims of breach of license agreement and trademark infringement are barred by the doctrine of acquiescence or waiver. And the court grants partial summary judgment on the claim that MRI continued to use TMR's trademark ConcenTrace after TMR terminated its license.

### 2.   Trademark Infringement and Unfair Competition

The undisputed facts also establish that MRI committed trademark infringement and unfair competition after TMR terminated MRI's trademark license in March 2005. MRI's admitted use of the TMR trademarks after the license was terminated constitutes trademark infringement as a matter of law. "In sum, the law is simple. If, as a matter of contract law, a service mark or trademark license has ended, the licensee has no right to continue use of the mark. Any such use is without the trademark licensor's consent and constitutes infringement." 4 McCarthy on Trademarks § 25:31 (citing Bunn-O-Matic Corp., 88 F. Supp. 2d at 922 ("The likelihood of confusion exists as a matter of law if a licensee continues to use marks owned by the licensor after termination of the license.")). See also Universal Money Ctrs., Inc. v. American Tel. & Tel. Co., 22 F.3d 1527, 1529 (10th Cir. 1994) ("The unauthorized use of 'any reproduction, counterfeit, copy, or colorable imitation' of a registered trademark in a way that 'is

likely to cause confusion' in the marketplace concerning the source of the different products constitutes trademark infringement under the Lanham Act."); 15 U.S.C. § 114(1)(a)-(b) (2005).

MRI raises two theories in its defense.  First, MRI argues that where MRI was both the manufacturer of the product and also the licensee of the ConcenTrace trademark, MRI's use of the phrase the "source of ConcenTrace" constitutes fair use that was within the scope of MRI's license. (Opp'n Mem. at 4; Anderson Aff. ¶ 13.)  But the fact that MRI had a limited contractual right to manufacture ConcenTrace for TMR, does not make it the "source" of ConcenTrace.  See Australian Gold, Inc. v. Hatfield, 436 F.3d 1228, 1238 (10th Cir. 2006) (stating that the unauthorized use of a registered trademark in a way that is likely to cause confusion in the marketplace concerning the source of different products constitutes trademark infringement under the Lanham Act).  The fair use defense does not apply because likelihood of confusion "exists as a matter of law if a licensee continues to use marks owned by the licensor after termination of the license." See Bunn-O-Matic Corp., 88 F. Supp. 2d at 922.

Second, MRI claims that TMR's trademark infringement claims are barred by the doctrine of "unclean hands."  To succeed on its defense, MRI must show that TMR's alleged inequitable conduct is sufficiently related to the substance of its trademark claim to give rise to an unclean hands defense.  See Worthington v. Anderson, 386 F.3d 1314, 1320 (10th Cir. 2004) ("the 'unclean hands' doctrine does not empower a court of equity to deny relief for any and all inequitable conduct on the part of the plaintiff.").  For the reasons stated below, the court is denying TMR's request for injunctive relief and so no analysis of this equitable defense is required.

For the foregoing reasons, because MRI used TMR's trademark ConcenTrace after TMR terminated its license, MRI committed trademark infringement.

### 3.    Injunctive Relief

TMR also seeks injunctive relief for MRI's trademark infringement.  Under the Lanham Act, this court has the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent . . . a violation [of the Act]."  15 U.S.C. § 1116(a).  TMR requests injunctive relief similar to the remedy affirmed in Australian Gold, Inc. v. Hatfield, 436 F.3d 1228 (10th Cir. 2006).  Specifically, it is asking the court to enjoin MRI from displaying any of TMR's trademarks or names on the Internet, using any of TMR's names and trademarks in the html code or displaying any false or misleading statements on any of its websites.  See id. at 1242.

MRI stated that it has removed all references to ConcenTrace on its website and that all metatags using ConcenTrace have been removed from MRI's html code.  (Opp'n Mem. at xx; Anderson Aff. ¶ 43.)  The court accepts MRI's representation.  If TMR discovers that MRI has not removed all references to ConcenTrace, it shall notify the court.  The court is under the impression that when MRI stated that it has removed all references to ConcenTrace on its website it includes any reference to itself as the "source of ConcenTrace."

Given the above assurances from MRI, TMR's request for injunctive relief is denied as moot.

### 4.    Breach of the Supply Agreement

TMR seeks summary judgment on MRI's claim that TMR violated Supply Agreement II because it obtained source minerals from a source other than MRI.  TMR does not deny that it obtained the source materials from someone else, but it contends that it had the right to do so because MRI became "noncompetitive" under the agreement thereby releasing TMR of its contractual obligations.  Section 9.4 of Supply Agreement II states:

>  TMR shall not obtain any sea water, Great Salt Lake water, and/or trace mineral complex products or product components from any source other than MRI/Northshore for as long as TMR remains MRI's exclusive distributor in the Health Food Store Channel, and <u>for as long as MRI is competitive on a supplement grade level</u>.

(Supply Agreement II at § 9.4 (emphasis added).)

According to TMR, MRI was not competitive because it refused to grant or renew licenses to end users of BULK products, which were necessary for TMR to fill its orders for BULK product. Section 9.2 provides the meaning of noncompetitive under the agreement:

>  TMR shall be bound to source any products or items from MRI if, but only if, MRI can, taking into account any new product complexity and developmental time and cost, produce a competitive product with a combination of price, production schedule, and quality, that is competitive with what is available in the open marketplace.

(<u>Id.</u> at § 9.2.)

But MRI provides evidence that it did not completely stop shipping BULK products to TMR. In a March 15 2006, letter from TMR's former attorney to MRI, TMR demanded that MRI ship orders for ten specific customers and stated in that "MRI has not responded to TMR's requests to fill <u>these orders</u>." (Letter from Mr. Waterfall to Mr. Lindley (Mar. 15, 2005) (emphasis added), attached as Ex. N to Miles Aff.) And MRI provides evidence that it did continue to ship orders for BULK products for TMR's customers that were properly licensed. (<u>See</u> Anderson Aff. ¶ 31.) According to testimony from Mr. Anderson, MRI did ship orders to two of the customers listed in the March 15 2006 letter from TMR's former attorney, and that the remaining eight customers listed in that letter either presented reasonable concerns to MRI that such customers would violate potential licenses or that they refused to complete the bulk license applications. (<u>Id.</u>)

Furthermore, MRI claims that TMR's interpretation of "competitive" is not reasonable

because it would cause MRI to be non-competitive any time MRI sought to enforce TMR's obligations under Supply Agreement II. MRI argues that the better interpretation of "competitive" focuses on MRI's obligation to "produce a competitive product," meaning the product must be "competitive in the open marketplace" as to "price, production schedule, and quality." (Opp'n Mem. at 13-14.)

The court finds that the meaning of "noncompetitive" under the Supply Agreement II is ambiguous. The agreement fails to provide specific language as to when a party may terminate under the contract. And, as noted above, genuine disputes of material fact exist as to whether MRI ceased filling BULK product orders under Supply Agreement II in violation of that agreement. Accordingly, TMR's partial summary judgment motion on this claim is denied.

## ORDER

For the foregoing reasons, the court ORDERS as follows:

1. TMR's Motion for Summary Judgment or, Alternatively, for Partial Summary Judgment (Dkt. # 39) is DENIED IN PART AND GRANTED IN PART.

2. MRI's Rule 56(f) Motion (Dkt. # 50) is DENIED.

3. MRI's Motion to Strike Certain Portions of the Affidavit of Craig Miles (Dkt. # 45) is DENIED.

4. TMR's request for Injunctive Relief is DENIED as moot.

SO ORDERED this 1st day of June, 2007.

BY THE COURT:

*Tena Campbell*

                    TENA CAMPBELL
                    Chief Judge