Blake D. Miller (4090)
Joel T. Zenger (8926)
**MILLER GUYMON, P.C.**
165 Regent Street
Salt Lake City, Utah 84111
Telephone: 801.363.5600
Facsimile:  801.363.5601

Paul H. Johnson (4856)
Blynn A. Simmons (10288)
**MINERAL RESOURCES INTERNATIONAL, INC.**
1990 West 3300 So.
Ogden, Utah  84401
Telephone: 801.731.7040
Facsimile: 801.731.7985

Attorneys for Defendants

---

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| TRACE MINERALS RESEARCH, L.C., | **FOURTH AMENDED COUNTERCLAIM AND THIRD PARTY COMPLAINT** |
| Plaintiff, | |
| | **(JURY TRIAL REQUESTED)** |
| vs. | |
| MINERAL RESOURCES INTERNATIONAL, INC.; BRUCE ANDERSON; and NORTHSHORE LIMITED PARTNERSHIP, a Utah limited partnership, | Case No. 1:06CV00068 TC<br>Judge Tena Campbell<br><br>Magistrate Brooke C. Wells |
| Defendants. | |
| MINERAL RESOURCES INTERNATIONAL, INC., | |
| Counterclaim and Third Party Plaintiff, | |
| vs. | |
| TRACE MINERALS RESEARCH, L.C.; ELEMENTS OF NATURE, INC.; MATT | |

KILTS; CRAIG MILES; SCOTT PERKES;
JAMES CRAWFORD; and JOHN DOES I
through X,

    Counterclaim and Third Party
    Defendants.

Counterclaim/Third Party Plaintiff Mineral Resources International, Inc. ("MRI") counterclaims against Counterclaim Defendant Trace Minerals Research, L.C. ("TMR"), and complains against Third Party Defendants Elements of Nature, Inc. ("Elements"), Matt Kilts, Craig Miles, James Crawford, Scott Perkes, CJM Enterprises, Inc., and John Does I – X, and alleges as follows:

## JURISDICTION AND VENUE

1.    This Court has original and supplemental jurisdiction over the claims of MRI pursuant to 28 U.S.C. §§ 1331, 1338(a) and 1367(a).

2.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c).

## THE PARTIES

3.    MRI is a Utah corporation with its principal place of business in Ogden, Utah.

4.    Counterclaim Defendant ("TMR") is a Utah limited liability company with its principal place of business in Ogden, Utah.

5.    Third Party Defendant Elements is a Utah corporation with its principal place of business in Hooper, Utah. The principal place of business of Elements is also the residence of Defendant Scott Perkes.

6.    Third Party Defendant Matt Kilts ("Kilts") is an individual residing in Hooper, Utah.

7.     Third Party Defendant Craig Miles ("Miles") is an individual residing in Morgan, Utah.

8.     Third Party Defendant James Crawford ("Crawford") is an individual residing in West Haven, Utah, and is an employee of TMR.

9.     Third Party Defendant Scott Perkes ("Perkes" and, collectively with Elements, Kilts Crawford and Miles, the "Elements Defendants") is an individual residing in Hooper, Utah.

10.     Third Party Defendants John Does I through X are unknown individuals or entities who have engaged in the conduct complained of herein.

## BACKGROUND

11.     Commencing in the late 1960's, the Anderson family has been involved in the manufacturer and marketing of trace minerals harvested from the Great Salt Lake.

12.     Prior to 1999, the Andersons conducted this business, in part, through various companies, including MRI and TMR.  In this endeavor, the Anderson family developed trademarks and tradenames domestically and internationally over this entire time period.

13.     As of April, 1999, MRI was the manufacturer of health food products containing such trace minerals (the "MRI Products") and also sold such products internationally.

14.     As of April, 1999, TMR was a distributor of MRI Products in the United States health food industry.  As of April, 1999, TMR did not sell internationally.

15.     As of April, 1999, MRI developed, owned and was using trademarks affiliated with the MRI Products sold internationally.  In addition, MRI had the exclusive perpetual right to use the "TMR logo" and "Old Label Design" for international use, the "New Label Design" in the Singapore

3

market (TMR used these domestically) and the tradenames for MRI Products sold internationally by MRI and sold domestically by TMR.

16.     As of April, 1999, TMR had no presence and had developed no use of trademarks or tradenames internationally.

17.     On or about April 6, 1999, a portion of the membership interests in TMR were sold to Kilts, Miles, Perkes, Bailey Hall and/or entities in which those persons have or had an interest.  The terms of that sale were included in a document titled "Trace Minerals Research Stock Purchase Agreement" ("Stock Purchase Agreement").  TMR's previous owners included members of the Anderson family, some of whom are also owners of MRI.

18.     As part, and as an express condition, of the 1999 sale of TMR, it was expressly agreed that the sale would not affect MRI's right to continue to use, in perpetuity, all logos or trademarks that it was using as of the date of the 1999 Sale.

19.     The consideration for the sale of TMR was only the United States health food market and certain royalty agreement.  No monies were paid for any international markets.

20.     In addition, TMR did not develop the international rights to the subject trade names and trademarks.

21.     Prior to the sale of TMR, MRI was TMR's exclusive supplier of trace mineral supplements.

22.      As part of the sale of TMR, TMR and MRI agreed that MRI would execute a revised supply agreement.

23.     MRI and TMR entered into an agreement titled "AGREEMENT BETWEEN MINERAL RESOURCES INTERNATIONAL AND TRACE MINERALS RESEARCH," with an

effective date of April 6, 1999 (the "Supply Agreement I").  Supply Agreement I established the terms and conditions for the sale of MRI-manufactured products to TMR as well as the obligations of TMR with respect to the sale and marketing of such products.

24.     In Supply Agreement I, "PRODUCTS" is defined as "products manufactured by MRI for TMR under TMR's labels," and "BULK SALES" is defined as "the sale of product in larger quantities or containers than are intended for retail purchase by end-user consumers …."

25.     According to the terms of Supply Agreement I, MRI licensed TMR to sell "PRODUCTS to and through HEALTH FOOD STORES in the EXCLUSIVE TERRITORY" for the term of that agreement.  EXCLUSIVE TERRITORY is defined in Supply Agreement I as HEALTH FOOD STORES in the United States of America and its territories.

26.     Supply Agreement I defines "TOTAL LICENSED AREA" as "TMR's EXCLUSIVE TERRITORY and NON-EXCLUSIVE TERRITORY and means everywhere that TMR has the right or license to sell THE PRODUCTS and/or BULK products."

27.     Supply Agreement I also provided that "[a]ll BULK sales occur by license only" and that "TMR agrees that it will always, under all circumstances, create licensing agreements (a format pre-approved by MRI) for every BULK sale it makes."

28.     On or about April 5, 2004, MRI and TMR entered into an agreement titled "AGREEMENT BETWEEN MINERAL RESOURCES INTERNATIONAL AND TRACE MINERALS RESEARCH" (the "Supply Agreement II").

29.     Supply Agreement II provides identical definitions of BULK SALES, EXCLUSIVE TERRITORY and TOTAL LICENSED AREA and a similar definition of PRODUCTS as are

provided in Supply Agreement I.  Supply Agreement II also uses the definition of PRODUCT as interchangeable with PRODUCTS.

30.     Section 2.4 of Supply Agreement II provides, in pertinent part: "[d]uring the term of this AGREEMENT, TMR agrees not to SELL outside TMR's TOTAL LICENSED AREA. * * * TMR also agrees not to sell to any third parties whom TMR knows intend to sell outside TMR's TOTAL LICENSED AREA and to take reasonable steps to know [*sic*]."

31.     At all relevant times, TMR agreed and acknowledged that MRI is the sole owner of all rights and interests in the formulas, specifications and process and any other rights pertaining to the Products as defined in the Supply Agreements.

32.     At all relevant times, TMR agreed and acknowledged that the foregoing formulas, specifications and processes are trade secrets of MRI.

33.     Pursuant to paragraphs 30.1 and 30.2 of Supply Agreement II, TMR agreed to protect and not disclose the trade secrets of MRI.

34.     Pursuant to paragraph 30.4 of Supply Agreement II, TMR agreed that "in the event of a breach of the provisions of this section, [MRI] may incur significant loss for which monetary damages may not be sufficient compensation, such that [TMR] shall, without limiting any other remedies available at law or in equity, be entitled to injunctive relief without requirement of bond, which bond requirement [TMR] hereby waives."

35.     .     Including but not limited to those situations set forth below, beginning almost as soon as the ink of the signatures was dry on the Stock Purchase Agreement, TMR engaged in an ongoing pattern of conduct to intentionally cause financial harm to MRI, and whereby TMR violated

the TOTAL LICENSED AREA and BULK SALES licensing/non-compete/non-disclosure provisions of Supply Agreements I and II as well as the individual licenses.

36.    In or about December 2003, MaxNature Health Products (d/b/a maxnature.com) ("MaxNature") applied for and was issued a bulk products license by MRI through TMR.  In its application to purchase BULK SALES products from MRI through TMR, MaxNature and TMR represented that they would not sell any such BULK SALES products outside of the United States.

37.    In or about December 2004, MRI's exclusive distributor in China, TPFTZ Horse International Trading Co. ("Horse Trading") made MRI aware that certain liquid trace mineral products purporting to have originated from MRI were being sold into China to a company known as Beijing Kuang Bao Trading Co. ("Kuang Bao").

38.    Shortly after learning of Kuang Bao purportedly selling MRI-manufactured products, Bruce Anderson, MRI's President, asked Matt Kilts, one of TMR's principals, if TMR had any knowledge of how the product was getting into China and whether TMR was familiar with Kuang Bao.  TMR denied any knowledge of knowing how the product was getting into China and denied any knowledge or familiarity with Kuang Bao.

39.    In or about December 2004, TMR requested that MRI renew MaxNature's license. MRI expressed serious concern about renewing the MaxNature license to TMR since it appeared from MaxNature's web site that MaxNature was marketing and selling internationally.  TMR asserted to MRI that MRI was required to renew the MaxNature license unless MRI had tangible proof that MaxNature had been selling internationally.

40.    MRI agreed to renew the MaxNature license if MaxNature posted a surety bond and other security provided.

41.     On or about January 27, 2005, MRI renewed the MaxNature license, which license provides that TMR will be subject to a $1,000 fine and to turn over to MRI all net profit from MaxNature's orders in violation of the license terms if documentation of a prohibited sale by MaxNature surfaced.  The license also required MaxNature to post a $10,000 security bond within ten (10) days of execution of the license agreement.

42.     On or about January 31, 2005, MRI received documentation from Horse Trading that led to the knowledge that MaxNature had been selling MRI-manufactured products into China.  MRI advised TMR of the violation and notified TMR that MaxNature's license was terminated effective immediately.

43.     TMR never paid any penalty for MaxNature's license violation as set forth in the renewed license, and TMR never forwarded the proceeds of any surety bond to MRI.

44.     In or about December 2005, Defendant Crawford visited with Mr. Lu Xiaoping (a/k/a Lu Xiao Ping, Richard Lu) ("Mr. Lu") in Beijing, China.  Mr. Lu is a principal of Kuang Bao as well as China Huayu Development Corp. (a/t/a China Hua Yu Development, Huayu Development, Hua Yu Development) ("Huayu").  Upon information and belief, Mr. Lu is also a principal of Mineral R. Resources International, formerly a Texas Limited Liability Company, but currently redomesticated in California.

45.     While visiting with Mr. Lu, Defendant Crawford delivered MRI-manufactured products to Kuang Bao.

46.     In or about January 2006, MRI's president, Bruce Anderson, informed TMR's president, Matt Kilts, that MRI had learned of James Crawford's trip to China and visit with Mr. Lu. Defendant Kilts initially misrepresented  that James Crawford had been in China, by denying  that

Mr. Crawford had even been in China.  When pressed on the issue by Bruce Anderson, Kilts admitted that James Crawford had been in China for a trade show, but that he had never met with Mr. Lu.  When further pressed on the issue, Kilts admitted that James Crawford did meet with Mr. Lu, but that none of the products that MRI manufactures were sold or delivered.

47.    On or about August 18, 2004, Defendant Kilts asked MRI whether TMR's sister company, White Egret, Inc. ("White Egret"), could sell bath salts at a trade show in Japan later that year.  Defendant Kilts was advised that MRI could not grant permission for such because it had a customer with an exclusive agreement to sell bath salts in Japan.  Upon information and belief, White Egret was administratively terminated by the Division of Corporations in or about October 2003 for White Egret's failure to renew its business registration.

48.    While visiting family in Japan in or about September 2004, the spouse of one of MRI's principals attended that trade show and discovered that White Egret was marketing MRI-manufactured trace mineral supplement products at that show, and performing a demonstration that is specific to those trace mineral supplement products.  The MRI employee also asked if she would be able to buy liquid trace minerals in bulk.  The person purporting to be a White Egret employee advised the MRI employee that White Egret would be able to sell liquid trace minerals in bulk.

49.    When MRI notified TMR that MRI-manufactured products were being illegally marketed in Japan, Defendant Kilts asserted that TMR committed no violation because it did not "sell" anything at that trade show.  Defendant Kilts also accused the MRI employee of lying about what she claimed she had witnessed at the trade show.

50.    Upon information and belief, in or about July 2005, TMR's principals, Kilts, Perkes, and Miles, filed articles of organization for Elements with the State of Utah, Department of

Commerce, Division of Corporations for the purpose of circumventing TMR's agreements with MRI, and specifically, to avoid the obligations, duties and restrictions contained in the Supply Agreement II and the licenses issued to TMR by MRI.

51.     From about August to November 2005, TMR, through its alter ego, Elements, was engaged in negotiations with a Korean company for that Korean company to purchase liquid trace mineral products from TMR/Elements.  During such negotiations, Defendant Crawford identified himself as TMR's international and bulk sales manager.  TMR also lists Crawford as TMR's international and bulk sales manager in several marketing communications.

52.     The Korean company stated it wanted to place an order for bottles of ConcenTrace. TMR/Elements agreed to sell liquid trace mineral products to the Korean company and represented that such products were ionic minerals derived from the Great Salt Lake in Utah.  TMR/Elements also represented that it could sell such ionic minerals in bulk to the Korean company.

53.     TMR/Elements, its principals and employees engaged in certain conduct intended to keep the Korean company from properly attributing trademarks to the products TMR/Elements would sell to the Korean company.

54.     During such negotiations between TMR/Elements and the Korean company, a TMR/Elements' representative or representatives intentionally misrepresented the identity of TMR/Elements and the identity or identities of the representative or representatives.  TMR/Elements also misrepresented its legal right to sell such trace mineral products to a Korean customer.

55.     In or about October 2005, TMR/Elements sold 200 bottles of ionic liquid minerals purporting to be from the Great Salt Lake in Utah to the Korean company

56.     On or about October 31, 2005, Defendant Miles sent a facsimile message to the shipping company chosen to deliver the products to the Korean company along with an invoice and Certificate of Analysis ("COA").   That facsimile message was on a fax coversheet of CJM Enterprises, Inc., listing a business address of 612 West Young Street, Morgan, Utah 84050.

57.     Upon information and belief, Miles is a principal of CJM Enterprises, Inc. and the aforementioned business address of CJM Enterprises, Inc. is Mr. Miles' home address.

58.     The airbill associated with that shipment indicates that the shipper of the product was CJM Enterprises C/O Elements's [*sic*] of Nature / Thor, and lists the shipper's address as 1280 West, 2550 South, Ogden, Utah.  That address is the business address of Thor Inc.

59.     COAs provided by TMR/Elements to the Korean company were MRI COAs adulterated by TMR/Elements to appear as if they were prepared by Elements.

60.     In or about April 2006, Jared Bowden, MRI's former Quality Assurance Manager, contacted Corey Anderson of MRI to inquire about the source of some of MRI's products.  Mr. Bowden indicated to Corey Anderson that he had been doing some consulting for TMR, and stated that TMR intended to sell products into Portugal and other international areas.

61.     On March 31, 2006, MRI hand-delivered a letter to TMR, which letter requested that, in accordance with section 2-609 of the U.C.C., TMR provide MRI with adequate assurances of TMR's compliance with and intent to comply with the Supply Agreement II.  That correspondence also advised that, pursuant to section 2-609 of the U.C.C., MRI would no longer accept TMR orders until the issue was resolved.

62.     On June 14, 2006, MRI served a "Notice of Default and Opportunity to Cure" upon TMR, outlining TMR's breaches of the Supply Agreement II.  As stated in that Notice and set forth

11

in Supply Agreement II, Supply Agreement II would terminate if TMR's breaches thereof were not cured within thirty (30) days of service of that Notice.

63.    TMR did not cure its breaches of the Supply Agreement II.

64.    After MRI served the request for adequate assurances on TMR, TMR ceased making payments to MRI for products that TMR had already received.  MRI advised TMR that withholding payment for products already received was improper if it was done in response to MRI's request for adequate assurances.  MRI also advised TMR that any amounts past due would be subject to the agreed-upon 5% penalty.

65.    By letter dated April 14, 2006, counsel for TMR advised MRI that TMR was withholding payment because MRI had suspended its performance.

66.    TMR, through its counsel, asserted in correspondences to MRI that MRI had no right to suspend performance, arguing that section 2-609 of the U.C.C. was inapplicable, which argument MRI asserted was meritless.

67.    Upon information and belief, at all times relevant hereto, Elements has acted as the alter ego of TMR.

**SALT LAKE MINERALS**

68.    Third Party Defendant Salt Lake Minerals, LLC ("SLM") was formed on or about February 9, 2006, by Third Party Defendants Schenk and Shaw.

69.    SLM was formed for the purpose of competing with MRI in the manufacturing, marketing and distributing of trace minerals and other products.

70.    Schenk and Shaw are both former employees of MRI.

71.    TMR demanded that MRI hire Schenk, which also led to the hiring of Shaw.

12

72.     As employees of MRI, Schenk and Shaw entered into non-competition and non-disclosure agreements ("Employment Agreements").

73.     After terminating their employment with MRI, Schenk and Shaw formed their own trace minerals company, Minerals 4 Health, LLC.

74.     Through Minerals 4 Health, Schenk and Shaw contacted MRI's customers and utilized MRI's trade secrets and other proprietary information.

75.     MRI entered into a supply agreement and special pricing agreement with Minerals 4 Health.

76.     The supply agreement required Minerals 4 Health to obtain trace minerals exclusively from MRI.

77.     In 2005 Schenk told MRI employees that he was going to own MRI.

78.     Around that same time Schenk made an offer to purchase MRI, which offer was refused by MRI.

79.     Shaw and Schenk also began a business relationship with TMR and Schenk turned over his commissioned accounts to TMR.

80.     Minerals 4 Health's website contained a link to TMR's website.

81.     Around that same time, Shaw and Schenk sought permission from MRI to sell MRI manufactured products in China.

82.     MRI did not grant Shaw and Schenk permission to sell MRI's products in China.

83.     Following MRI's refusal to allow Shaw and Shenk to sell MRI manufactured products in China, Shaw and Schenk formed SLM.

84.    On or around February 22, 2006, SLM in concert with Leroy Schenk/Schenk Family Limited Partnership (hereafter collectively referred to as "SFLP") wrongfully submitted an Application for Food Establishment Registration in the name of SLM using an inspection of the Anderson's Northshore mineral harvesting facility and representing that such was for SLM, when in fact SLM has no rights or responsibilities relating to the Northshore operation, and signing the application that such was the property of SLM..

85.    Since the formation of SLM, Shaw and Schenk, through SLM and in conjunction with TMR, have continued to utilize MRI's trade secrets and proprietary information, as well as, continuing to contacting MRI's current and former customers, the identity of whom Shaw and Schenk learned while employed by MRI.

86.    Upon information and belief, SFLP, Shaw and Schenk, individually and through SLM, have acted in concert with TMR to put MRI out of business and/or take over MRI's customers and markets.

87.    Furthermore, upon information and belief, SLM has threatened MRI with a meritless shareholder derivative lawsuit to further injure MRI.

**MRI'S ELETE TRADEMARK**

88.    From 2003 to the present, MRI has marketed a successful sports performance product known as ELETE.

89.    ELETE is an electrolyte replacement dietary supplement designed to be added to water and used by endurance athletes to replace electrolytes lost during exercise.

90.    MRI has expended a great deal of time, effort, and money to market, advertise and promote ELETE.

91.     MRI has expended a great deal of time, effort, and money developing its intellectual property rights in connection with ELETE.

92.     As a result of the significant amount of time, effort, and money expended by MRI, ELETE has become a highly successful product that can be purchased on the internet and through various distributors both within the United States and internationally.

**TMR'S TORTIOUS AND INFRINGING ACTS**

93.     TMR is a distributor of dietary supplements, including electrolyte replacement products.

94.     TMR has, and is currently, marketing and selling ELETE as a TMR product and using the ELETE mark or ELETE copy in its marketing of its own copycat electrolyte replacement product, ENDURE.

95.     As of the filing of this pleading, TMR's website, http://www.traceminerals.com/products/endure.html, utilizes the copy created by MRI for its ELETE mark in TMR's marketing of ENDURE by sometimes only making one change from the original statement that MRI had created for its ELETE product - "Water + Elete = Maximum Performance" to now read "Water + ENDURE = Maximum Performance or at other times continuing with is blatant use of the overall MRI created intellectual property.

96.     TMR further utilizes this same minor change from the MRI ELETE mark copy through its on-line retail affiliates, including, but not limited to, Nokomis Nutrition Online, located at www.nokomisnutrition.com; Mineral Oasis, located at www.mineraloasis.com; and Total Health Discount Vitamins, located at www.totaldiscountvitamins.com.

## COUNT ONE
## FALSE DESIGNATION OF ORIGIN (Lanham Act ' 43(a))
### (Against all Counterclaim and Third Party Defendants)

97.     MRI realleges and incorporates all preceding paragraphs of this Counterclaim.

98.     Counterclaim and Third Party Defendants placed false designations of origin and false descriptions or representations of origin on products designed, created and manufactured by MRI, and distributed such products in interstate commerce, both domestically and internationally. Specifically, and without limitation, the Counterclaim and Third Party Defendants affirmatively represented that products designed, created and manufactured by MRI were manufactured by Elements of Nature, Inc., and shipped MRI's products without labels.

99.     MRI owns the "OmniMin" trademark.  TMR represented and continues to represent in marketing materials that it owns the "OmniMin" mark.

100.    TMR has and continues to represent that it harvests, manufactures or otherwise produces the products that MRI manufactured for TMR.

101.    TMR continues to represent that the products it sells are derived from the Great Salt Lake.

102.    TMR has, and continues to use in its various marketing materials, the history, experience and pedigree of the Anderson family.  Such claims are false.

103.    The false designations, descriptions and representations made by the Counterclaim and Third Party Defendants are likely to cause consumer confusion regarding the source of the products.

104.    MRI has been harmed by the false designations, descriptions and representations of the Counterclaim and Third Party Defendants by, among other things, having been deprived of the

value of its name and of the goodwill that would otherwise stem from public knowledge of the true source of its products.

## COUNT TWO
## BREACH OF CONTRACT
### (Against Counterclaim Defendant TMR)

105.     MRI realleges and incorporates all preceding paragraphs of this Counterclaim.

106.     Pursuant to the Supply Agreement II, Counterclaim Defendant TMR agreed, among other things, (a) that it would not sell products supplied to it by Plaintiff outside of the designated territory, (b) that it would not sell such products to any third party whom it knew intended to sell the products outside of the designated territory, (c) that it would take reasonable steps to know whether any such third party intended to sell the products outside of the territory, and (d) that MRI would be TMR's exclusive source for certain products.  Counterclaim Defendants have breached all of the foregoing obligations under the Supply Agreement II and continue to profit thereby.

107.     On or about April 18, 2006, MRI informed TMR that TMR had violated the terms of section 2.4 of the Supply Agreement II, that because of TMR's violations those licenses and TMR's bulk licenses were thereby terminated, and that, pursuant to section 2.4 of the Supply Agreement II, TMR was required to return to MRI the bulk account contact information and account histories to then enable  those accounts to be serviced by MRI, the proper owner of the accounts.  Despite MRI's numerous demands to turn over the bulk account contact information and account histories, TMR refused to do so and has not done so in breach of the terms of the Supply Agreement II.

108.     Pursuant to the terms of Supply Agreement II, TMR is prohibited from obtaining "any sea water, Great Salt Lake Water, and/or trace mineral complex products or product components from any source other than MRI/ North Shore for as long as MRI remains MRI's exclusive

17

distributor in the Health Food Store Channel and for as long as MRI is competitive on a supplement grade level."  MRI never ceased to be competitive during the term of Supply Agreement II, and Counterclaim Defendant TMR and its alter ego, Elements, obtained sea water, Great Salt Lake water and/or trace mineral complex products and/or product components from a source or sources other than MRI, in breach of the terms of the Supply Agreement II.

109.    Counterclaim Defendant TMR utilized and continues to utilize MRI's formulas, which are the intellectual property of MRI as agreed to by the executed Stock Purchase Agreement, and that contained trace mineral complexes other than MRI's and which other trace mineral complexes were meant to be a substitute for MRI's trace mineral complexes, in breach of the terms of Supply Agreement II and Stock Purchase Agreement.

110.    Counterclaim Defendant TMR was and is obligated by the terms of the Supply Agreement II to not disclose any confidential information, including MRI's trade secrets and TMR was and is obligated to ensure that none of its officers, directors and employees disclose any of MRI's trade secrets.  Additionally, the Supply Agreement II requires that TMR have its officers, directors and employees sign and agree to the terms of the Individual Confidentiality Agreement, which is attached to the Supply Agreement II as Exhibit H.  TMR, its officers, directors and certain of its employees have disclosed MRI's trade secrets in breach of the terms of the Supply Agreement II.

111.    Supply Agreements I and II require that all product BULK SALES be done by license agreement.  Licenses entered into between MRI and TMR for BULK SALES of trace mineral products require that TMR provide labels and marketing materials associated with those BULK mineral products to MRI.  TMR has failed to provide such labels and marketing materials for many

BULK SALES, despite MRI's repeated requests to TMR that it do so.  Such failure to provide labels and marketing materials where required constitutes a breach of the individual license agreements as well as Supply Agreements I and II.

112.    Pursuant to a Memorandum of Understanding attached to Supply Agreement II as Exhibit J, TMR would be assessed a 5% penalty for any amounts owed to MRI not paid within thirty (30) days of delivery of products.  In response to MRI's request for adequate assurances and withholding of performance pursuant to U.C.C. § 2-609, TMR ceased making payments to MRI. After negotiations between counsel, TMR did eventually pay the principal amounts owed, but did not pay the 5% penalty applicable to late payments.  Such failure to pay the 5% penalty on late payments constitutes a breach of the Supply Agreement II.

113.    As set forth in this Counterclaim, and as will be uncovered in discovery in this case, TMR breached its obligations under the Supply Agreement II and the other agreements between the Parties.

114.    MRI has performed all of its obligations under the Supply Agreement II.

115.    MRI has and continues to incur damages as a result of such breach.  The exact amount of damages will be proven at trial.

### COUNT THREE
### BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
#### (Against Counterclaim Defendant TMR)

116.    MRI realleges and incorporates all preceding paragraphs of this Counterclaim.

117.    Counterclaim Defendant TMR breached its legal duty to MRI to act in good faith and fair dealing with respect to the Supply Agreement II by, including, but not limited to, knowingly and intentionally selling and distributing products outside of the designated territory, by obtaining

products from sources other than MRI, by attempting to conceal such conduct from MRI through the use of related corporations and entities, and through false representations.

118.    MRI has and continues to incur damages as a result of such breach.  The exact amount of damages will be proven at trial.

### COUNT FOUR
### INTENTIONAL INTERFERENCE WITH CONTRACT
**(Against the Elements Defendants)**

119.    MRI realleges and incorporates all preceding paragraphs of this Counterclaim.

120.    The Elements Defendants intentionally and improperly interfered with the performance of the Supply Agreement II by Counterclaim Defendant TMR by inducing or otherwise causing TMR to breach its obligations under the Supply Agreement II.  Specifically, and without limitation, the Elements Defendants caused TMR to (a) distribute products outside of its exclusive territory in violation of the contract, (b) sell products to third parties whom they knew intended to sell the products outside of the designated territory, and (c) source products from suppliers other than MRI in violation of the contract.

121.    MRI was damaged as a direct result of the conduct of the Elements Defendants, and are entitled to recover all damages resulting from such conduct, including punitive damages.  The exact amount of such damages will be proven at trial.

### COUNT FIVE
### INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS
**(Against All Counterclaim and Third Party Defendants)**

122.    MRI realleges and incorporates all preceding paragraphs of this Counterclaim.

123.     Pursuant to section 2.4 of Supply Agreement II, TMR is obligated to turn over to MRI bulk account contact information and account histories because of TMR's licensing violations.

124.     TMR has failed to turn over bulk account contact information and account histories to MRI.

125.     Upon information and belief, Defendant Crawford has contacted bulk accounts that should have been turned over to MRI and has advised those accounts that TMR, not MRI, would be servicing those accounts' bulk mineral supplement needs.

126.     MRI was damaged as a direct result of the conduct of Counterclaim and Third Party Defendants' conduct, and is entitled to recover all damages resulting from such conduct, including punitive damages.  The exact amount of such damages will be proven at trial.

### COUNT SIX
### MISAPPROPRIATION OF TRADE SECRETS
### IN VIOLATION OF THE UNIFORM TRADE SECRETS ACT
### UTAH CODE § 13-24-1, *et seq.*
**(Against All Counterclaim and Third Party Defendants)**

127.     MRI realleges and incorporates all preceding paragraphs of this Counterclaim.

128.     Counterclaim Defendant TMR and Third Party Defendants Elements, Kilts, Perkes, Miles, and Crawford have disclosed and/or used MRI trade secrets that they knew or had reason to know were acquired under circumstances giving rise to a duty to maintain the secrecy of such trade secrets and/or derived such trade secrets from or through a person or persons who owed a duty to maintain the secrecy of MRI trade secrets in violation of Utah Code § 13-24-1, *et seq.*

129.    As set forth in section 30 of the Supply Agreement II, TMR and MRI agreed that either party would be entitled to injunctive relief in the event that any trade secret of the other were disclosed by either party or either party's employees.

130.    MRI was damaged as a direct result of the conduct of all Counterclaim and Third Party Defendants, and MRI will suffer irreparable harm if all Counterclaim and Third Party Defendants and any other potential parties who may have acquired MRI's trade secrets by improper means are not enjoined from further use or disclosure of such trade secrets.

### COUNT SEVEN
### UNJUST ENRICHMENT
**(Against all Counterclaim and Third Party Defendants)**

131.    MRI realleges and incorporates all preceding paragraphs of this Counterclaim.

132.    Counterclaim and Third Party Defendants have been unjustly enriched by the use, sale and distribution of MRI's products and substitute products sourced elsewhere, and the false and misleading labeling thereof.

133.    Unjust enrichment would result if the Counterclaim and Third Party Defendants were allowed to retain the benefits obtained through their unlawful use of MRI's products.

134.    Plaintiffs are entitled to recover the benefits unjustly obtained by the Counterclaim and Third Party Defendants.

### COUNT EIGHT
### DECLARATORY JUDGMENT
**(Against TMR)**

135.    MRI realleges and incorporates all preceding paragraphs of this Counterclaim.

136.    A dispute exists between MRI and TMR regarding the ownership of and rights to the various tradenames and trademarks used by the two companies.

137.    As between MRI and TMR, at all times MRI has possessed the right to use all trademarks, tradenames and logos it was using as of the 1999 sale of TMR.

138.     MRI is entitled to a declaratory judgment that there are no prohibitions, as between MRI and TMR, prohibiting MRI from continuing to use all trademarks, tradenames and logos it was using as of the 1999 sale of TMR.

<strong><u>COUNT NINE</u><br><u>TRADEMARK INFRINGEMENT</u><br>(Against TMR)</strong>

139.    MRI realleges and incorporates all preceding paragraphs of this Counterclaim.

140.    TMR has infringed and continues to infringe on MRI's ELETE trademark through use of the ELETE mark in the marketing and promotion of TMR's ENDURE product.

141.    TMR, through its attorneys, has represented that it has discontinued the use of the ELETE mark.

142.    TMR's continued use of the ELETE trademark is likely to cause confusion or mistake or to deceive purchasers and potential purchasers into believing that TMR's products and services are the same as MRI's products and services, or that TMR's products and services are in some way affiliated with, sponsored, authorized, approved, sanctioned, or licensed by MRI.

143.    TMR's actions constitute trademark infringement in violation of 15 U.S.C. §§ 1114 and 1125 in that their actions are likely to mislead consumers and potential consumers into believing that TMR's goods are affiliated with, or are sponsored, authorized, approved, or sanctioned by, MRI.

144.     Upon information and belief, TMR is using the ELETE mark knowingly, willfully, with actual malice, and in bad faith, in an attempt to create confusion in the marketplace.

145.     TMR's infringing conduct has caused MRI to sustain irreparable harm and other damages in an amount to be determined at the time of trial.

146.     TMR's unlawful activities, as alleged, have caused, and unless enjoined by this Court will continue to cause, irreparable damage, loss, and injury to MRI for which MRI has no adequate remedy at law.

147.     In accordance with 15 U.S.C. §§ 1116 and 1117, MRI should be awarded injunctive relief and its actual damages, costs, and attorney's fees, as well as TMR's profits derived from their infringing activities, said amounts to be trebled by virtue of TMR's knowing and willful behavior.

## COUNT TEN
## UNFAIR COMPETITION
### (Against TMR)

148.     MRI realleges and incorporates all preceding paragraphs of this Counterclaim.

149.     TMR has unfairly competed with MRI through its use of the name ELETE in the marketing and distribution of TMR's competing product, ENDURE.

150.     TMR's continued unfair competition relating to the ELETE trademark through use of the ELETE mark is likely to cause confusion or mistake or to deceive purchasers and potential purchasers into believing that TMR's products and services are the same as MRI's and/or that TMR's products and services are in some way affiliated with, sponsored, authorized, approved, sanctioned, or licensed by MRI.

24

151.     TMR's actions constitute unfair competition in violation of 15 U.S.C. §§ 1114 and 1125 in that their actions are likely to mislead consumers and potential consumers into believing that TMR's goods are affiliated with, or are sponsored, authorized, approved, or sanctioned by, MRI.

152.     TMR has, and continues to use, the ENDURE mark in a manner designed to mislead consumers and potential consumers into believing that the ENDURE product is the same as MRI's ELITE product.

153.     TMR's unfairly competitive conduct has caused MRI to sustain irreparable harm and other damages in an amount to be determined at the time of trial.

154.     TMR's unlawful activities, as alleged, have caused, and unless enjoined by this Court will continue to cause, irreparable damage, loss, and injury to MRI for which MRI has no adequate remedy at law.

155.     In accordance with 15 U.S.C. §§ 1116 and 1117, MRI should be awarded injunctive relief and their actual damages, costs, and attorney's fees, as well as TMR's profits derived from their infringing activities, said amounts to be trebled by virtue of TMR's knowing and willful behavior.

## COUNT ELEVEN
## UNFAIR COMPETITION – UTAH COMMON LAW
### (Against TMR)

156.     MRI realleges and incorporates all preceding paragraphs of this Counterclaim.

157.     TMR's adoption and use of the infringing ELETE trademark constitute unfair competition under the laws of Utah because such use is likely to cause confusion or mistake or to deceive purchasers and potential purchasers into believing that TMR's products and services are the

same as MRI's products and services, or that TMR's products and services are in some way affiliated with, sponsored, authorized, approved, sanctioned, or licensed by MRI.

158.    By its actions, TMR unfairly competed with and continues to unfairly compete with MRI.

159.    TMR's unfairly competitive conduct has created, or is likely to create, a misperception in the minds of the consuming public that ENDURE is a part of a family of products sponsored, authorized, approved, or sanctioned by MRI.

160.    Upon information and belief, TMR has engaged in this activity knowingly, willfully, with actual malice, and in bad faith, so as to justify the assessment of increased, exemplary and punitive damages against it in an amount to be determined at trial.

161.    TMR's infringing conduct has caused MRI to sustain irreparable harm and other damages in an amount to be determined at the time of trial.

162.    TMR's actions have caused, and unless enjoined by this Court will continue to cause, irreparable damage, loss, and injury to MRI for which MRI has no adequate remedy at law.

### COUNT TWELVE
### UNFAIR COMPETITION ACT – UTAH CODE ANN. § 13-5A-101, *et. seq.*
### (Against TMR)

163.    MRI realleges and incorporates all preceding paragraphs of this Counterclaim.

164.    The actions of TMR constitute an intentional business act and practice that is unlawful, unfair, and fraudulent, and has led to a material diminution in value of MRI's intellectual property.

165.    The actions of TMR constitute an infringement of MRI's ELETE trademark.

166.     Pursuant to Utah Code Ann. § 13-5a-103, MRI is entitled to actual damages caused by TMR's trademark infringement, as well as, costs and attorney fees, and punitive damages.

**COUNT THIRTEEN**
**CONVERSION.**
**(Against TMR)**

167.     MRI realleges and incorporates all preceding paragraphs of this Counterclaim.

168.     TMR has, and currently, represents to the public that it is selling products containing formulas identical to the MRI owned formulas for the Products, as defined in the Supply Agreements.

169.     TMR has converted for its own use such product formulas owned by MRI.

170.     TMR is liable for the value of such converted formulas.

**COUNT FOURTEEN**
**CIVIL CONSPIRACY**
**(Against all Counterclaim and Third Party Defendants)**

171.     All of the above-stated allegations of this Complaint are incorporated herein by this reference.

172.     The Counterclaim and Third Party Defendants comprise a combination of two or more persons.

173.     The Counterclaim and Third Party Defendants, by themselves, and/or in conjunction with SFLP, SLM, Schenk and Shaw, had a meeting of the minds on a course of action to engage in the violations and wrongful acts alleged herein, the purpose of which was to deprive MRI of its interests in, and profits from, MRI's contractual and licensing rights as set fort above, to avoid TMR's, contractual obligations, duties and restrictions as set forth above, and to

put MRI out of business and/or force MRI to sell,  at below fair market value, its business to the Counterclaim and Third Party Defendants.

174.    As a result of the Counterclaim and Third Party Defendants' unlawful acts, MRI has been damaged in amounts to be proven at trial.

175.    Counterclaim and Third Party Defendants' are jointly and severally liable for all direct, consequential, and punitive damages caused by the unlawful acts committed in furtherance of the conspiracy in amounts to be proven at trial.

176.    Because Counterclaim and Third Party Defendants' acts were willful, intentional, malicious and manifested a knowing and reckless indifference toward, and disregard of MRI's rights, MRI is entitled to recover from Counterclaim and Third Party Defendants' punitive damages in an amount to be proven at trial.

WHEREFORE, MRI requests this Court to enter judgment on its behalf and against the Counterclaim and Third Party Defendants as follows:

1.    Under Count One, for judgment in favor of MRI and against Counterclaim and Third Party Defendants as follows:

a.    An injunction against each Counterclaim and Third Party Defendant and their respective officers, directors, agents and employees, enjoining them from using any false designation of origin or false description of any product manufactured by MRI.

b.    An amount determined to be Plaintiff's damages, plus interest, attorneys' fees and the costs of this action.

c.    That the damages awarded to MRI be trebled.

d.    For punitive damages.

2.      Under Count Two, for judgment in favor of MRI and against Counterclaim Defendant TMR in an amount determined to be MRI's damages, plus interest and attorneys' fees and costs of this action in accordance with the terms of the contract.

3.      Under Count Three, for judgment in favor of MRI and against Counterclaim Defendant TMR in an amount determined to be MRI's damages, plus interest, attorneys' fees and the costs of this action.

4.      Under Count Four, for judgment in favor of MRI and against the Elements Defendants in an amount determined to be MRI's damages, plus interest, punitive damages, attorneys' fees and the costs of this action.

5.      Under Count Five, for judgment in favor of MRI and against Counterclaim and Third Party Defendants in an amount determined to be MRI's damages, interest and the costs of this action, and for an Order: (1) commanding Counterclaim and Third Party Defendants to turn over to MRI all bulk account contact information and account histories; and (2) enjoining Counterclaim and Third Party Defendants from further interference with MRI's business relations with those bulk account customers.

6.      Under Count Six, for judgment in favor of MRI and against all Counterclaim and Third Party Defendants for injunctive relief, Counterclaimant's damages to be determined at trial and interest thereon, and exemplary damages pursuant to Utah Code § 13-24-1, *et seq.* as well as attorneys' fees and the costs of this action.

7.      Under Count Seven, for judgment in favor of MRI and against the Counterclaim and Third Party Defendants in an amount determined to be MRI's damages, plus interest and the costs of this action.

8.      Under Count Eight, for a declaratory judgment that there are no prohibitions, as between MRI and TMR, prohibiting MRI from continuing to use all trademarks, tradenames and logos it was using as of the 1999 sale of TMR.

9.      Under Count Nine, for injunctive relief and for damages, costs and attorneys' fees, including TMR's profits derived from its infringing activities, said amounts to be trebled by virtue of TMR's knowing and willful behavior.

10.     Under Count Ten, for injunctive relief and for damages, costs and attorneys' fees, including TMR's profits derived from its infringing activities, said amounts to be trebled by virtue of TMR's knowing and willful behavior.

11.     Under Count Eleven, for injunctive relief and for damages, costs and attorneys' fees, including TMR's profits derived from its infringing activities, said amounts to be trebled by virtue of TMR's knowing and willful behavior.

12.     Under Count Twelve, for judgment awarding MRI its actual damages caused by TMR's trademark infringement, as well as, costs and attorney fees, and punitive damages.

13.     Under Count Thirteen, for judgment awarding MRI the value of the converted formulas.

14.     Under Count Fourteen, for judgment awarding MRI its actual damages caused by Counterclaim and Third Party Defendants' conspiracy, as well as costs, attorney fees, and punitive damages.

15.     Under all Counts, for such other and further relief as the Court deems appropriate, including MRI's costs and attorneys' fees in bringing this action.

**JURY DEMAND**

MRI hereby demands trial by jury.

DATED this 27th day of February 2008.

MILLER GUYMON, P.C.


/s/ Joel T. Zenger_____
Blake D. Miller
Joel T. Zenger
Attorneys for Defendants